The following STATEMENT OF THE CASE is found in appellant's brief and is adopted in appellee's brief:
 "The December 1982, term grand jury for the Circuit Court of Coffee County, Alabama, Elba Division, returned an indictment against the Appellant, Don Lamar Cady, charging the Appellant with engaging in sexual intercourse with [a named individual, whose name we omit], a female, by forcible compulsion in violation of Section 13A-6-61 of the Code of Alabama, against the peace and dignity of the State of Alabama.
 "On December 13, 1982, the undersigned attorney was appointed to represent the Defendant and arraignment was conducted. The defendant pled not guilty and the matter was placed on the jury docket. "Motion for Discovery was filed, granted, and discovery furnished by the District Attorney's Office of Coffee County, Alabama.
 "On March 24, 1983, the case was brought to trial and on March 25, 1983, a jury returned a verdict of guilty against the Defendant as charged. The Defendant served oral notice of a working appeal and requested a sentence hearing. The sentence hearing was conducted on April 8, 1983, wherein, the Defendant was adjudged guilty and sentenced to life imprisonment in the penitentiary of the State of Alabama. Defendant again gave notice of appeal seeking a working appeal and the undersigned attorney was then appointed to represent the Defendant on his appeal.
 "On April 26, 1983, a Motion for New Trial was filed by the Defendant. On May 9, 1983, a hearing was conducted and Motion for New Trial was denied. After the denial of the Motion for New Trial, appellant has prosecuted this appeal."
The alleged victim testified that she was 17 years old at the time of the trial. Her last birthday was during the month before the trial. The incident involved occurred approximately fourteen months before the trial, which means that the victim was 15 years of age, lacking a month or two of being sixteen years of age, at the time of the incident. The alleged victim was the only eyewitness who testified as to what occurred at the time and place of the incident. She testified that on the night of January 19, 1982, she and a girl friend had been to a ball game at the gym at Elba High School, and that after the game a friend of the two drove them to a house, and thereafter to another home. Continuing in her testimony, the alleged victim said that she went from home to home and after calling her mother she realized she had dropped her sock and she "went back to find it." Her testimony continued as follows:
 "Q. And what path did you follow when you went back to find it?
"A. The same one that —
"Q. All right. Will you show us that?
 "A. All right. I walked back around and I was looking down, and then I walked and cut through here and that's when the man — who was parked in the car — blue car.
"Q. All right. You say blue car.
"A. Right here.
 "Q. And you also stated earlier in your testimony you had seen a blue car. Does this appear to you to be the same blue car?
"A. Yes.
"Q. Okay. What happened then?
 "A. And then he got out of the car and asked me did I know somebody and I *Page 103 
didn't know the name, but he pointed away and I looked that way and about the time I looked he grabbed my neck.
 "Q. With regard to where you were standing and with regard to that distance — and I realize it's not drawn to scale — but with reference to that diagram, approximately where were you standing?
 "A. About right here [evidently pointing to a diagram] in the driveway —
". . . .
"Q. What if anything occurred at that point?
 "A. He grabbed my neck and then he told me not to make any noise and not to scream or he would kill me or something like that. I don't remember exactly what words it was said. Then I told him not to hurt me. I would do almost anything.
"Q. Go ahead.
 "A. At this time he still had my neck and he had pressure on it. And then he pulled me back sort of behind the house but it wasn't exactly behind, like if somebody walked by he probably would have saw us. And he told me to take my pants down and so I did — and he still had me by the neck —
". . . .
 "Q. What happened after he drug you back to this other area?
"A. He told me to take my britches — my pants down.
"Q. What if anything did you do?
"A. I took them down.
"Q. Why?
"A. Because I didn't want to get hurt and killed.
"Q. Were you afraid?
"A. Yes, sir."
The victim's testimony continued for several more pages of the transcript. We quote therefrom only such portions as are pertinent and perhaps material to the issues presented on appeal:
"Q. Then what happened?
 "A. And then I know he was choking me and I guess I passed out because the next thing I remember I was laying down and a bunch of sticks was around me and he was on me.
". . . .
"Q. You say you think you must have blacked out?
"A. Yes.
"Q. But you did awaken?
"A. Yes.
"Q. And you say he was on top of you?
"A. Yes.
". . . .
 "Q. Did this individual have his penis in your vagina?
 "MR. SHIRLEY [Defendant's attorney]: Again, Your Honor, we object to leading the witness. And object to the improper form.
"THE COURT: Overruled.
"MR. SHIRLEY: We except."
 ISSUES I AND II
The first two issues presented by appellant are as follows:
 "I. The trial court committed reversible error when permitting the State over timely objection of Defendant, to elicit testimony from the Prosecutrix through improper, leading questions concerning a material element of the charge.
 "II. The failure to establish penetration by Defendant upon the Prosecutrix in a charge of rape results in a failure of the State of Alabama to establish a crime has been committed."
The two issues presented as applied to this case are in conflict with each other. As shown in appellant's brief, the two issues pertain to the testimony of the alleged victim on direct examination which we have quoted above. By the first issue, appellant contends that the trial court erred in admitting testimony by the victim that penetration, "a material element of the charge," occurred. By the second issue, it is contended that the evidence fails to show a penetration. As to the first issue, we would have no difficulty in disposing of it adversely to appellant, if the witness had been a few years younger, as were the witnesses, fourteen years of age or *Page 104 
younger, in cases cited by Judge McElroy in the footnote to Gamble, McElroy's Alabama Evidence, § 121.05 (8) (3d ed. 1977):
 "A child should, as far as possible, be permitted to tell, in his own language, what he saw and heard before resort is made to leading questions. It is, however, within the discretion of the trial court to permit leading questions asked of an immature witness on direct examination by the party who called him."
Even though the witness was older than the witnesses in the cases cited, we believe the nearness of the age of the witness in the instant case to the ages of the witnesses in the cited cases, whose answers to leading questions on direct examination were authoritatively approved, is a proper factor to be considered in this case; especially so, we think, because of the delicacy of the subject matter. Furthermore, we note that the question could have been definitely answered by "Yes" or by "No." Although the "yes" or "no" answer test is not a conclusive test, we are assisted by it, when applied to all the circumstances herein, in our effort to resolve appellant's first issue, i.e., whether the question under consideration was leading. As stated by Judge Harwood, afterwards Justice Harwood, in Williams v. State, 34 Ala. App. 603, 42 So.2d 500,503 (1949), cert. denied, 252 Ala. 602, 42 So.2d 504:
 ". . . The `yes' or `no' answer test may furnish assistance in many cases in determining the leading character of a question, but it is uncertain and inconclusive, and the ends of justice cannot be served by its mechanical application."
We conclude that the trial court was not in error in overruling defendant's objection to the question. We further conclude that, as the answer disclosed clearly that there was penetration, there is no merit to appellant's contention that there was a "failure to establish penetration."
 III.
Appellant asserts, as his third contention for a reversal, the following:
 "The trial court committed reversible error when it permitted, over objection of Defendant, the introduction of the details of the complaint given by the Prosecutrix to the investigating police officer."
The issue is complex, and we are not in full agreement with the argument of either the appellant or the appellee on the question. The investigating police officer referred to in the foregoing quotation was Officer Kenneth R. Paul, who, at the time of the trial, was a police officer with the Greenville Police Department; at the time of the alleged crime in this case, he was "the investigating officer" of the Elba Police Department. Upon being called as a witness by the State, he testified for about two pages of the court reporter's transcript until there was a colloquy among the attorneys, the trial judge, and the witness, out of the hearing of the jury. Soon after the hearing in the presence of the jury resumed, the following occurred during the direct examination of Officer Paul:
 "Q. Did she tell you any details of the alleged rape itself?
". . . .
"Q. What did she tell you?
"MR. SHIRLEY: We would object.
"THE COURT: Overruled.
 "MR. SHIRLEY: And we would move to exclude the previous testimony.
"THE COURT: Overruled.
 "A. She said that her and some of her friends were walking home from a basketball game and they were going to Kennedy Estates. She said there was a trail along through the woods going to Kennedy Estates and they were walking up that trail. She said that while they were walking she saw a blue car ride up and down the street several times but she didn't think anything about it. She said at one place on the trail there was a big mud puddle and she stepped in it and went on through it. And she said her shoe and her sock had mud all over them. She took one shoe and one sock off. She said that they kept walking and when they got up behind the house over there in Kennedy Estates that she looked down *Page 105 
and she noticed that one of her socks was missing. The sock she had pulled off and stuck in her shoe was missing. So, she asked a friend if she would go back with her to hunt it. And she told her no she was going on. So, she turned around and started back down the same trail that they had just come up hunting her sock. She said she passed by a blue car parked beside the street. She stated then that a black male got out of the car, started walking up to her asking her if she knew somebody or knew where somebody lived, that she couldn't understand what he was saying. She said once he got close enough to her he grabbed her around the throat. She said he told her then not to scream or he would hurt her and kill her and told her to take her pants off. So she said she started taking her pants off. Then she acted like she had stepped on a piece of glass, so he kind of eased his hold. Then she broke away and started to run. He caught her and started choking her again. She said at that time he threw her on the ground and she scratched him in the face. She said then he just started squeezing her neck real tight. The next thing she could remember was when she woke up and the person was on top of her. She said at that time she asked him where her clothes were. And the person told her that he would go get her clothes and not to scream. At that time the person got up, the black male, and ran and jumped in his car and left. So, she got up and found her clothes, put her clothes on and about this time her mother came driving by so she went and got in the car with her mother and they came to the Police Department.
 "Q. Randy, I believe she told you her assailant had gotten out of a vehicle and she was giving you a description of that vehicle, is that right?
"A. Yes, sir.
"Q. I believe you testified that's —
 "MR. SHIRLEY: Excuse me, Your Honor, I object. It's repetitious, it's leading and he's —
"THE COURT: Yes. Sustained.
"Q. She described the vehicle?
"A. Yes."
We agree with the position taken by appellant to the effect that the principle that a prompt complaint by the victim of rape or other sex offense, consistent with her testimony, is admissible in evidence, is not broad enough to include testimony as to the details thereof.
 "It is a well established rule in Alabama that testimony concerning the prosecutrix' complaint must be confined to the fact of the complaint. Details of the occurrence such as showing the identity of the person accused, the injuries claimed to have been sustained, or other minute circumstances of the offense are not admissible [authorities cited]." Lawson v. State, Ala.Cr.App., 377 So.2d 1115, 1118
(1979), cert. denied, Ala., 377 So.2d 1121.
The principle just stated has exceptions. One exception is found in the permissible introduction of evidence as to the details of the victim's complaint for the purpose of corroborating the victim's testimony on direct examination as to the details of the crime, as to which the victim has been subjected to cross-examination calculated to reflect upon her credibility as a witness. During the cross-examination of the victim, covering more than twenty pages of the court reporter's transcript, she was questioned intensively and extensively as to almost all of the details of what occurred for several minutes before, during, and several minutes after, the commission of the crime, in an obvious effort to discredit her testimony on direct examination that she had been raped by defendant. The following is applicable, as stated in another rape case:
 "Counsel for the appellant by attempting to discredit the prosecutrix' story, and by going into her mental and physical state on cross-examination, opened the door for the State, for purposes of corroboration, to prove the details of the complaint and to show the appearance of the prosecutrix at the time complaint was made. Cox, supra, [Cox v. State, 280 Ala. 318, *Page 106 193 So.2d 759 (1967)]; Barnett v. State, 83 Ala. 40, 3 So. 612 (1887)." Fisher v. State, 57 Ala. App. 310, 328 So.2d 311, 317 (1976), cert. denied, 295 Ala. 401, 328 So.2d 321.
Details of the complaint made by the victim to the investigating officer, when considered as a whole, were properly admitted in evidence. Defendant sought no ruling as to any specific portion of the details.
 IV.
The fourth issue presented in appellant's brief is as follows:
 "The State failed to predicate Prosecutrix' identification of Defendant in court on evidence the identification was based upon factors other than the pre-trial viewing of Defendant; and the State, failing to lay the proper predicate that the photographic line-up and physical lineup involving the Defendant were not suggestive, before permitting testimony of same and identification of the Defendant was error, prejudicially injurious to the Defendant."
We have considerable difficulty in analyzing discretely the contentions that are brought together in appellant's fourth issue, but we endeavor to do so.
In the first paragraph of appellant's argument in support of his fourth contention for a reversal, it is stated:
 "The trial court committed reversible error when the court permitted the Prosecutrix to identify the Defendant in court without the State of Alabama proving the pre-trial identification did not influence, prejudice or bias the witness' judgment making the in court identification. The Appellant objected to the identification because no evidence was presented at the trial to show the in court identification was not tainted by the pre-trial identifications of the Defendant."
Appellant is correct in further asserting in his brief that during a colloquy, out of the presence of the jury, the State "admitted there had been a pre-trial photographic identification and a pre-trial physical lineup," at which the victim had identified the defendant. The photographic identification was within the next day, and the lineup identification was approximately a month after the alleged crime and several months before an indictment was returned against defendant.
The crux of appellant's contention in support of his fourth issue seems to be stated in the following, the third paragraph of his argument as to the issue:
 ". . . Appellant submits the burden was placed upon the State to demonstrate constitutional fairness on each of these pre-trial identifications and lay the predicate that the identification process at these pre-trial identifications by the Prosecutrix had not tainted her then in court identification. The Court overruled Appellant's request. Thereafter, a motion to exclude the evidence was restated after the evidence was introduced."
Although appellant cites a number of authorities pertaining to the ofttimes necessity and importance of a careful scrutiny of an in-court identification of the accused as the person who committed the alleged crime involved, beginning with UnitedStates v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149
(1967), and concluding with Moore v. Illinois, 434 U.S. 220,98 S.Ct. 458, 54 L.Ed.2d 424 (1977), he cites no case or other authority in support of his quoted contention, with which we do not agree. This is not to say that there could not conceivably be cases in which there is an odor of taint caused by extrajudicial identification that should be removed as the responsible source of an in-court identification before evidence of an in-court identification is admitted, but there is no occasion for believing that there was any such scent in the instant case. In addition to what we have termed the crux of appellant's fourth issue, appellant argues that the court should not have admitted in evidence, over defendant's objections, either of the pre-trial identifications. We consider such question as addressed to the identification of the exhibition of photographs and at the lineup. *Page 107 
The evidence as to the photographic identification and the identification at the lineup is in the testimony of Officer Paul, on direct examination, in pertinent and material part as follows:
 "Q. Randy, I want to back you up a little bit. Did you have an occasion to see [the named alleged victim] on the day of the 20th?
"A. Yes, sir.
"Q. Where was it that you saw her?
"A. At her home.
 "Q. And did you at that time — did you display or make what we call a photographic display for her?
"A. Yes, sir.
"Q. And what was the purpose of doing that?
"A. For identification.
 "Q. And can you tell us the approximate time difference between the incident which was reported as having occurred and the time that you showed her this photographic display?
 "A. The incident occurred approximately between 9:00 and 10:00 o'clock p.m. on the 19th. We showed her the photographs at approximately 9:00 o'clock the next morning.
 "Q. Now, was the only one present that viewed that display?
"A. Her and her mother.
 "Q. And can you tell us what the display consisted of?
"A. Yes, sir. Eight pictures.
"Q. Of what?
"A. Of black males.
 "Q. What instructions if any did you give her with regards to that display?
 "A. I told Miss [surname of the witness] to take her time and look at the pictures. If she saw the person that raped her to tell me and if she didn't see him to tell me she didn't see him.
"Q. All right. How were the photographs shown to her?
 "A. I laid them on the coffee table in two rows of four.
 "Q. So, they were all placed in front of her at one time?
"A. Yes, sir.
"Q. Did she select a photograph?
"A. Yes, sir.
"Q. And whose photograph did she select?
"MR. SHIRLEY: We object to that, Your Honor.
"THE COURT: Overruled.
 "MR. SHIRLEY: We except. We would like to state that there has been no predicate laid, no showing to the Court or the jury of the photographs, and that this is hearsay from this witness as to the selection what photograph.
 "MR. HEAD: He is testifying to a physical thing she did, Judge.
"THE COURT: Overruled.
"Q. Did she select a photograph?
"A. Yes.
"Q. Whose?
"A. Mr. Cady.
 "Q. Now, Randy, did you have occasion to get with Miss [surname of alleged victim] on another occasion concerning a line-up identification?
"A. Yes.
"Q. Can you tell us when and where that was?
 "A. February 17th, 1982, at the Covington County Jail.
 "Q. What was the nature of that particular line-up if you will tell us?
 "A. Six people, including Mr. Cady, were lined up in a room. Miss _____ came to the door and saw me and I told her the same thing again, to look at everyone of them and if she saw the person that had raped her to point him out to me and if she didn't to tell me she didn't see him.
"Q. Did she point anybody out?
"A. Yes, sir.
 "MR. SHIRLEY: We would object, again, Your Honor. It's hearsay. It's irrelevant and immaterial.
"THE COURT: Overruled.
"Q. Could you tell us who she pointed out?
"A. Mr. Cady. *Page 108 
 "MR. SHIRLEY: Your Honor, we need to approach the bench to make a statement.
 "(Thereupon, the following occurred at Judge's Bench out of the hearing of the jury):
 "MR. SHIRLEY: We move to exclude the testimony of where the line-up took place on the grounds that it infers that the defendant was incarcerated, guilty of an offense for which at this time the State has no right nor privilege to introduce and it infers that the defendant is guilty of some other criminal offense when such testimony at this time during the trial is not permissible to be introduced. Also, we would move to exclude the testimony on the grounds that the State has not proven that the line-up that was conducted was fair, reasonable, and consistent with person or persons that appear like the defendant. There has been no evidence introduced in the trial for the benefit of the jury or the Court to decide whether or not the line-up was Constitutionally fair nor has there been any evidence that the photographs were in any way related to — similar or different or any evidence as to the photographs and we will move to exclude both the photographic line-up and the line-up itself. It is a violation of his Constitutional rights, both the 5th and the 6th Amendments of the Constitution.
"THE COURT: Overruled."
On cross-examination of Officer Paul, he testified:
 "Q. Okay. Now, on the occasion that you were at this line-up, did you talk to Mr. Cady?
"A. Yes, sir.
"Q. Did you advise him of his rights?
"A. No, sir. I didn't.
 "Q. Do you remember how many people were there, other people were there?
"A. Five and Mr. Cady.
"Q. So, there were six?
"A. Yes, sir.
 "Q. And the first one in line was Mr. Cady, wasn't it?
"A. No, sir.
"Q. Where was he?
 "A. I don't remember exactly what his position was in there.
"Q. You don't remember exactly?
"A. No, sir, it's on the report.
"Q. Uh-uh. Well, how many of them were black?
"A. All of them.
 "Q. How many of them were his height within two inches?
"A. All of them should have been.
 "Q. Should have been? You are not telling us that they were, are you?
"A. They should have been within two or three inches.
 "Q. I know they should have been, but you are not telling me they are, are you?
 "A. I'm not — it's on that report. How tall they were and all.
"Q. Well, you remember going over there, don't you?
"A. I sure do.
 "Q. And you can't tell them without looking at the report, is that what you are saying?
 "A. I don't remember all of them's names and exactly how tall they were.
"Q. You don't remember how tall they were?
"A. No, sir. Not exactly.
 "Q. So, you can't tell this jury how many of them were within two inches of his height?
 "A. I don't remember six people's different height and all that.
"Q. You don't know how many of them were his weight?
"A. All of them were close.
"Q. Okay. And how about their hair?
"A. It was about the same.
"Q. What do you mean about the same?
"A. About the same length.
 "Q. About the same length? Did all of them have their hair braided?
 "A. Some of them did. I don't remember exactly how many.
"Q. How many?
"A. I don't remember exactly how many. *Page 109 
"Q. Well, is that on that report that you've got?
"A. I'm not sure.
"Q. That's right. It wasn't in there, was it?
"A. I don't know about that.
 "Q. That's right. And that's what you were over there to do, wasn't it, Officer Paul?
"A. I don't know what you mean.
"Q. Huh?
"A. I don't know what you mean.
 "Q. You weren't over there to know what was going on in the investigation?
"A. Yes, sir.
"MR. HEAD: Judge, we object. This is argumentative.
"THE COURT: Sustained.
 "Q. So, you don't know how many of them had braided hair?
"A. No, sir.
 "Q. You remember that Mr. Cady had his hair braided that day, do you not?
"A. Yes, sir.
 "Q. Well, was he the second one when you walked in there?
"A. No, sir.
"Q. Were you by yourself on that occasion?
"A. No, sir.
". . . .
 "Q. How long were you all there looking at this line-up, do you remember?
"A. Just a couple of minutes.
"Q. A couple of minutes?
"A. Yes, sir.
"Q. Two minutes?
"A. Two or three minutes.
 "Q. Two or three minutes. I guess you had the lights on then?
"A. Yes, sir. The lights were on.
 "Q. Do you have any independent recollection on that occasion that there was anybody as tall as Mr. Cady or taller than Mr. Cady in that line-up?
 "A. Yes, sir. There was at least one taller and at least one shorter that I can remember.
"Q. And how much taller and how much shorter?
 "A. About — one was about three inches taller and one was about one or two inches shorter.
"Q. Where were they in relation to Mr. Cady?
 "A. The best as I can remember he was standing, as you are facing the line-up, he was either the next to the last or the last one.
 "Q. And these people that were taller were over on the opposite end?
"A. No, sir.
"Q. You don't remember?
"A. I don't remember exactly.
 "Q. So, you can't tell the jury that the tall person was beside him, is that right?
"A. No, sir.
 "MR. SHIRLEY: That is all I have right now. I will reserve the right to further cross-examination."
There was no further testimony by Officer Paul. Our review of the transcript convinces us that there was no suggestiveness or other improper conduct on the part of the officers preceding, or during the time of, the photographic identification or the lineup identification by the alleged victim of the defendant as the person who had raped her.
In our opinion, there was no error prejudicial to defendant in any of the rulings of the trial court pertaining to the admission in evidence of the victim's in-court identification, the photographic identification, or the line-up identification of the defendant by the alleged victim.
 V.
Appellant states the fifth and final issue presented in his brief as follows:
 "The trial court erroneously permitted witness Paul to testify to a conclusion unsupported by personal knowledge and unsupported by the fact."
This issue is the least pressed of the five issues presented by appellant, and the least argued by either party. It pertains to *Page 110 
the following portion of the testimony of Officer Paul on direct examination:
 "Q. Within the two hours preceding the report of this alleged rape, what duties did you perform?
 "A. I was patrol officer. I had the north side of town at that time.
"Q. And what did that include? What area of town?
"A. From the Taylor Mill Road north.
 "Q. All right. Now, specifically, did you — while you were on that patrol and within some two hours preceding before this complaint, did you see a vehicle consistent in description with that given by [the alleged victim]?
"A. Yes, sir.
 "Q. And having seen that, what if anything did you do? Now, and this preceded the report of the rape, is that correct?
"A. Yes, sir.
"Q. What did you do when you saw that vehicle?
 "A. I turned the car around, the patrol car around, and took the tag number down.
"Q. And where was that that you saw that vehicle?
 "A. On the Taylor Mill Road in front of Rusty Gray's Grocery.
 "Q. Are you familiar with the area where this alleged incident occurred?
"A. Yes, sir.
"Q. And how far was that from where this took place?
"A. Approximately two blocks.
 "Q. Two blocks? Did you later determine — you say you got the tag? Did you later determine the owner of the vehicle you saw on January 19th, 1982?
"A. Yes, sir.
 "MR. SHIRLEY: Object, Your Honor. He has laid no predicate upon how he can testify to that.
"MR. HEAD: I will lay the predicate, Your Honor.
"MR. SHIRLEY: Well, I object at this time.
"THE COURT: Overruled.
"Q. Yes or no, did you determine that?
"A. Yes, sir.
"Q. How?
"A. Through vehicle tag registration —
"MR. SHIRLEY: We object to that, Your Honor.
"THE COURT: Overruled.
 "Q. And who did you determine to be the owner of that —
 "MR. SHIRLEY: For the record, I would like to move to exclude that testimony because it's not the best evidence to show the ownership of an automobile.
"THE COURT: Overruled.
 "Q. Now, who did you determine to be the owner of that vehicle?
"A. Mr. Cady.
"MR. SHIRLEY: We object, Your Honor.
"THE COURT: Overruled.
"Q. Mr. Cady?
"A. Yes, sir."
Although we question the soundness and correctness of the action of the State in its injection into the evidence reference to the ownership of the automobile that Officer Paul had seen in the vicinity of the alleged crime a short time before he commenced his investigation of the crime, an automobile that fit the description by the victim of the automobile she saw her rapist occupy prior to and after the rape, we fail to follow the reasoning of appellant in his contention that the court committed reversible error in any of its rulings, set forth in the above-quoted portion of the transcript, as to the testimony of Officer Paul as to the motor vehicle seen by him. We note, with one exception, that every objection made by defendant's counsel to any question asked the witness by the State as to the ownership of the automobile was made after the witness had completed his answer. The single exception is found in an objection made while the witness was in the process of making an answer. A motion to exclude "that testimony" was made while the witness was being asked another question. The specific question and answer as to which appellant now complains, that is, the question that brought forth the *Page 111 
answer by the witness that he had determined the defendant owned the automobile, was not objected to until after the question was answered. Immediately thereafter, the question was asked again, but in another form, and the witness repeated his previous answer; thereafter there was neither an objection nor a motion to exclude as to the particular testimony. No error was committed prejudicial to defendant by any of the rulings of the trial court as to the ownership by defendant of the automobile seen by Officer Paul near the place and about the time the alleged crime occurred.
We find no error prejudicial to appellant in any of the issues presented and are convinced that the evidence was overwhelmingly to the effect that defendant was guilty as charged in the indictment. We should say, however, in fairness to appellant, that, notwithstanding his resting his case without calling any witnesses in his behalf, the State's evidence disclosed without dispute that defendant unequivocally denied knowledge of the crime, as well as any participation by him.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.